## Staunton

LaVerne T. Motko Strauss v. Princess Anne Marine and Bulkheading Company, Inc., Et Al.

American Acceptance Corporation v. LaVerne T. Motko Strauss, Et Al.

September 6, 1968.

Record Nos. 6738 and 6739.

Present, All the Justices.

W. C. Pender (Pender, Coward, McDuffie & Addison, on brief), for appellant, Record No. 6738.

James M. Pickrell; William T. Prince; Beril M. Abraham; Walkley E. Johnson, Jr. (Ralph D. Katherman; Kellam and Kellam; Williams, Cocke, Worrell & Kelly; Russo, White and Katherman, on brief), for appellees, Record No. 6738.

Walkley E. Johnson, Jr. (Baird, Crenshaw & Ware, on brief), for appellant, Record No. 6739.

W. C. Pender; James M. Pickrell; William T. Prince; Beril M. Abraham (Ralph D. Katherman; Pender, Coward, McDuffie & Addison; Kellam and Kellam; Williams, Cocke, Worrell & Kelly; Russo, White and Katherman, on brief), for appellees, Record No. 6739.

Carrico, J., delivered the opinion of the court.

This is a dispute among various lienors over a fund representing the surplus of the proceeds of a foreclosure sale of property known as the Sea Mist Motel in the city of Norfolk. The principal contenders are the Princess Anne Marine and Bulkheading Company, Inc., the holder of a mechanic's lien, LaVerne T. Motko Strauss, the holder of four promissory notes secured by deeds of trust, and American Acceptance Corporation, the holder of two judgments.

S & L Enterprises, Inc., was the owner of the Sea Mist Motel on Chesapeake Bay. On March 7, 1962, a severe storm, known as the Ash Wednesday storm, washed away the sand and dirt between the shoreline and the motel building, exposing the building's foundation and leaving its rear stairway suspended in the air.

S & L contracted with Princess Anne to erect a 317 foot long bulkhead at a cost of $10,144.00 to protect the property from further damage by high tides and from the possibility of the building's being carried "out into the bay" in the event of another storm. Princess Anne performed the required work, and upon S & L's failure to pay the agreed price therefor, filed a mechanic's lien against

the Sea Mist property for its claim. Princess Anne's subcontractor, Atlantic Creosoting Company, Inc., later filed its own mechanic's lien for $4,625.10.

At the time the mechanics' liens were filed, there were of record against the Sea Mist property the following deeds of trust:

1. Deed of trust dated August 21, 1961, from S & L to Philip L. Russo and Samuel I. White, trustees, securing payment of a bond payable to Durham Life Insurance Company in the amount of $146,000.00.

2. Deed of trust dated January 16, 1962, from S & L to Herbert L. Kramer, trustee, securing payment of three notes payable to bearer in the aggregate amount of $40,800.00.

3. Deed of trust dated February 27, 1962, from S & L to Herbert L. Kramer, trustee, securing payment of one note payable to bearer in the amount of $4,200.00.

The notes secured by the second and third deeds of trust were originally held by Industrial Security Loan Corporation, but at the time of the litigation, they were held by LaVerne T. Motko Strauss.

On March 7, 1963, Princess Anne filed a bill of complaint seeking enforcement of its mechanic's lien against the Sea Mist property. S & L; Russo and White, trustees; Durham Life; Kramer, trustee; and Atlantic Creosoting were named parties defendant, and all filed answers. On April 17, 1963, a decree was entered referring the cause to T. J. Amelson, a commissioner in chancery, for inquiry and report.

While the mechanics' lien suit was pending, S & L defaulted in payment of the first trust indebtedness due Durham Life; and at the latter's direction, Russo and White, trustees, on June 13, 1963, sold the Sea Mist property at public auction to Ken-Carl Corporation for the sum of $202,000.00 and gave their deed to the purchaser.

On August 21, 1963, Russo and White, trustees, filed their separate bill of complaint alleging that after the foreclosure sale, they had discharged Durham Life's indebtedness and that there remained in their hands a balance of $43,657.26 (later increased to $43,709.81). The bill made reference to the pending mechanics' lien suit of Princess Anne, to the docketing and recording of a number of judgments and other liens against S & L, and to the existence of a dispute among certain of the lienors, "particularly, LaVerne Motko [Strauss] and Princess Anne . . . as to the order in which the funds in the hands" of the trustees should be paid.

The bill of the trustees prayed that they be permitted to pay the funds into court and that the court "determine the claims of . . . and the order of priority of payment as between" the holders of the various liens on the property, who were named parties defendant. American Acceptance, which secured its judgments after the trustees' bill was filed, was permitted to intervene as a party defendant.

Princess Anne filed an answer to the bill in which it alleged that it had "a duly recorded Mechanic's Lien against the Sea Mist Motel, which lien transferred itself and became a first lien on the proceeds of the funds now deposited to the Court." Princess Anne prayed that its lien "be declared a first and valid lien against the proceeds."

Mrs. Strauss, with Princess Anne's answer in hand, filed her own answer admitting that there was "a dispute between her and Princess Anne . . . as to the order in which the funds . . . should be disbursed." Mrs Strauss prayed that the court determine the claims of the parties "and the order of priority of payment thereof."

American Acceptance, when it was permitted to intervene in the case as a party defendant, filed no answer. Its petition to intervene did not challenge Princess Anne's asserted right to claim against the funds held by the trustees.

On December 20, 1963, a decree was entered, without objection, permitting the trustees to pay into court the funds in their hands and referring the cause to T. J. Amelson, the same commissioner to whom the mechanics' lien suit had been referred, "for the purpose of determining the priorities as between the various respondents to the funds hereby paid into court."

On March 9, 1966, the court entered a decree consolidating the trustees' suit with the mechanics' lien suit brought by Princess Anne and re-referring the causes to T. J. Amelson, commissioner in chancery.

On April 27, 1966, the commissioner in chancery filed a 33-page report. He found that Atlantic Creosoting had not timely filed its mechanic's lien or given notice thereof, but that the lien of Princess Anne inured to the benefit of Atlantic Creosoting. He recommended that the mechanics' liens be afforded "preferential payment out of the funds on deposit" and that "any monies remaining" be paid on account of the notes held by Mrs. Strauss, thus consuming the funds held by the court.

American Acceptance and Mrs. Strauss filed exceptions to the commissioner's report. The court overruled the exceptions, con-

firmed the report, and entered a final decree carrying out the commissioner's recommendations. Mrs. Strauss and American Acceptance were granted separate appeals.

At this point, it is necessary to determine what is before us to be decided. Most of the controversy in this court has centered around a contention of Mrs. Strauss and American Acceptance that if the trial court and the commissioner were correct in their finding that the mechanic's lien of Princess Anne was superior to the liens of the second and third deeds of trust, it was also superior to the lien of the first deed of trust. The foreclosure of the first deed of trust, it is argued, "would have been subject to the mechanics lien which could have been, and still can be, enforced against the property but not against the proceeds of sale." Thus, the argument concludes, Princess Anne has no right to claim against the funds paid into court by the trustees, but must proceed against the property alone for satisfaction of its lien.

The difficulty with the contention advanced by Mrs. Strauss and American Acceptance is that no reading, however minute, of the printed record or of the manuscript record will disclose that the point upon which they now rely so heavily was ever raised in the trial court. Only one vague reference in the record suggests that the point might have been raised. On November 30, 1966, the trial judge addressed a letter to counsel stating that the court had, by letter of August 11th, "determined this matter," but that entry of the final decree had been postponed at the request of Mrs. Strauss' counsel "to assert a defense not heretofore argued," and that the court's opinion, after considering the "various memorandums," was unchanged. What the new defense was, or how it was raised, is not disclosed.

The record before us is conclusive that the cause was tried in the court below upon the theory that when the property was sold at foreclosure, any rights Princess Anne had as the result of its mechanic's lien were transferred to the surplus funds realized from the foreclosure sale. That was the sole and precise theory advanced by Princess Anne in its answer to the trustees' bill of complaint, and upon it, the parties joined issue. The contest thereafter became merely a matter of fighting over who was to be paid first from the funds paid into court by the trustees.

This is an appellate court, and it hears cases on the theory upon which they were tried in the lower court, reviewing those points

properly raised, decided, and preserved. There is before us no pleading, no evidence, no finding of the commissioner, no exception to the commissioner's report, no memorandum, no ruling of the trial court, nor any exception to the final decree bringing into focus the point now sought to be relied upon by Mrs. Strauss and American Acceptance; and we will not, therefore, consider the point. *Spence* v. *Hospital Corporation*, 202 Va. 478, 480, 117 S. E. 2d 657, 658 (1961); *Mister* v. *Mister*, 180 Va. 364, 366-367, 23 S. E. 2d 152, 153 (1942); *Fuller* v. *Edwards*, 180 Va. 191, 195, 22 S. E. 2d 26, 28 (1942); *Strange's Adm'r* v. *Strange and Als.*, 76 Va. 240, 242-243 (1882).

We turn now to a disposition of the questions which are before us for decision. Mrs. Strauss attacks the commissioner's findings, which were confirmed by the trial court, that the bulkhead constructed by Princess Anne was a "new structure" and that it increased "the value of the property exclusive of the land . . . by an amount in excess of the claims of the mechanics' lienors," thereby entitling the mechanics' liens to the priority over existing liens and encumbrances established by Code, § 43-21.[1]

Mrs. Strauss argues that the bulkhead "was not a new independent structure" but "a replacement of already existing protection which was deemed to be inadequate." She further describes the bulkhead as "an addition to the existing building." And she says there was only "a shot in the dark guess" of the extent to which the bulkhead increased the value of the property.

---

[1] "§ 43-21. *Priorities between mechanics' and other liens.*—No lien or encumbrance upon the land created before the work was commenced or materials furnished shall operate upon the building or structure erected thereon, or materials furnished for and used in the same, until the lien in favor of the person doing the work or furnishing the materials shall have been satisfied; nor shall any lien or encumbrance upon the land created after the work was commenced or materials furnished operate on the land, or such building or structure, until the lien in favor of the person doing the work or furnishing the materials shall have been satisfied.

"In the enforcement of the liens acquired under the previous sections of this chapter, any lien or encumbrance created on the land before the work was commenced or materials furnished shall be preferred in the distribution of the proceeds of sale only to the extent of the value of the land estimated, exclusive of the buildings or structures, at the time of sale, and the residue of the proceeds of sale shall be applied to the satisfaction of the liens provided for in the previous sections of this chapter. Provided that liens filed for performing labor or furnishing materials for the repair or improvement of any building or structure shall be subject to any encumbrance against such land and building or structure of record prior to the commencement of the improvements or repairs or the furnishing of materials or supplies therefor. Nothing contained in the foregoing proviso shall apply to liens that may be filed for the construction or removal of any building or structure."

There is nothing in the record, however, to support the assertions of Mrs. Strauss that the bulkhead was a replacement of or an addition to an existing structure. There was evidence that at one time there had been some sort of a protective structure on the property but that at some undisclosed other time, it had been destroyed by some unknown means.

The evidence relating to the nature of the work performed by Princess Anne and the effect thereof upon the value of the property came from the representatives of Princess Anne, and was uncontradicted. M. J. Owens, sales manager, testified that after the Ash Wednesday storm, S & L "called to get us to install a bulkhead and a contract was drawn up." Owens identified the contract, and it was introduced as an exhibit. It provided that Princess Anne would "install a bulkhead at the Sea Mist Motel," and made no mention of "repair or replacement of" or "addition to" an existing facility. Owens stated that his company "followed the contract specifically."

Owens further testified that the S & L property "had a concrete block wall at one time" but "that had been destroyed" and "it had nothing." He also said that construction of the bulkhead was "an emergency" and that tenants "were afraid to stay in the building" because it looked like "a high tide or another storm would sink the back of the building in." Owens concluded his testimony by saying that the bulkheading work appreciated the value of the property by fifty percent.

George Susewind, president of Princess Anne, testified that he supervised "construction" of the bulkhead "the total time it was being built," and that his company's work was "an emergency" because without it "the foundation could have been eroded and the building collapsed on that end." He further stated that he "would guess" the value of the property was "somewhere around $200,000," but that without the bulkhead, the property "would be unsaleable other than the lot."

The bulkhead, which was described as being 317 feet long, is depicted in a photographic exhibit. It is a wooden structure supported by pilings, located a short distance to the rear of the motel building, and not attached thereto.

The commissioner examined thoroughly into the question of the nature of the work performed by Princess Anne. He found specifically that the bulkhead "was not for the purpose of repairing damages to the previously existing building, but is in fact a new structure

erected on the premises for the express purpose of protecting the motel building against future damage arising out of an excessive high tide or a storm."

The commissioner also inquired carefully into the value question. He noted the testimony of Owens and Susewind, whose qualifications to testify as to value were not challenged; the price paid for the property at the foreclosure sale; and the fact that the tax assessment on the property was increased by $12,400.00 after the work was done. He found specifically that "the value of the property exclusive of the land was increased by an amount in excess of the claims of the mechanics' lienors." We are of opinion that the commissioner's findings were supported by the evidence.

This brings us to the final question presented, which is raised by the appeal granted American Acceptance.

It will be recalled that the notes secured by the second and third deeds of trust on the Sea Mist property were originally held by Industrial Security Loan Corporation, but at the time this litigation was under way, they were held by Mrs. Strauss. American Acceptance contends that the transaction by which Mrs. Strauss secured the notes resulted in the satisfaction and discharge of the indebtedness covered thereby and the relinquishment of the liens of the deeds of trust, thus disentitling Mrs. Strauss to claim against the funds held by the court. Mrs. Strauss contends, on the other hand, that she purchased the notes and thus retained the liens of the deeds of trust.

The evidence relating to this question is as follows:

S & L was organized in 1960 by William T. Shuey, the brother of Mrs. Strauss, and Ernest T. Levidy for the purpose of investing in and developing real estate. The corporation experienced financial difficulties, and Shuey prevailed upon his sister, Mrs. Strauss, to lend her credit and advance sums of money to finance the corporation's activities. The Sea Mist Motel was the company's principal asset.

The second and third deeds of trust on the Sea Mist property secured loans received by S & L from Industrial Security in January and February of 1962. By the fall of that year, payment of the loans was in default, and foreclosure of the deeds of trust was threatened. Shuey again sought his sister's assistance, and she sold some stock she owned to finance the transaction concerning the notes held by Industrial Security. This final transaction brought Mrs. Strauss' financial involvement in the affairs of S & L and her brother to approximately $122,000.00.

Mrs. Strauss, who resided in Cleveland, Ohio, did not testify before the commissioner in chancery concerning the note transaction. However, her Cleveland attorney, J. Bruce Kitchen, did testify. He stated that he negotiated with Industrial Security "regarding the purchase of these notes" and that the notes "were purchased from Industrial Securities" with funds realized from the sale of American Home Products stock owned by Mrs. Strauss, the proceeds of the sale being used to pay off a prior loan "and the balance . . . in the neighborhood of $59,000 . . . was used to buy the four notes and the deeds of trust securing same from Industrial Securities."

Herbert L. Kramer, attorney for Industrial Security and the trustee under the deeds of trust, testified that he negotiated with Kitchen in the transaction. Kramer stated that "Kitchen, representing Mrs. [Strauss], purchased from Industrial Security Corporation the notes comprising our second deed of trust and the one note comprising our third deed of trust." Kramer spoke of Kitchen's making "the purchase" for Mrs. Strauss and of "the purchase price." He also said, "they bought the notes from us."

Armond Caplan, president of Industrial Security, testified that the debt due his firm was paid and that "the note" was delivered "to the parties that purchased it."

The notes involved are exhibits in the record before us. They have not been marked "paid"; they have not been cancelled; and they do not bear any evidence showing that the transaction was other than a sale and purchase. The deeds of trust were not released of record.

The sole bit of evidence upon which American Acceptance relies to sustain its contention that the commissioner erred in holding that the transaction was a purchase by Mrs. Strauss is contained in an agreement allegedly entered into in April or May of 1963 between Mrs. Strauss and her brother, William T. Shuey. Under the agreement, styled "Contract of Sale, Release and Pledge Agreement," Shuey, who by that time had become owner of all the S & L stock, would have transferred his stock to Mrs. Strauss and surrendered control of the corporation to her in view of the advances she had made. The agreement was subject to the performance of a number of conditions by Shuey; and upon such performance, Mrs. Strauss would have been obligated to return the stock to him.

The language of the agreement upon which American Acceptance relies is contained in a preamble setting forth the various sums of money which Mrs. Strauss had advanced to her brother, as follows:

"together with the sum of $60,011.87 advanced by the said LaVerne T. [Strauss] in satisfaction of a second deed of trust existing on the Sea Mist Motel."

American Acceptance says that the "sole issue" is Mrs. Strauss' intention at the time she made payment to Industrial Security; that the use of the word "satisfaction" in the agreement is "the only evidence of [Mrs. Strauss'] intentions"; and that such use conclusively shows that she intended to extinguish the indebtedness and not to purchase the notes.

The evidence showed that Shuey never performed the conditions of the agreement; that he surreptitiously secured a copy thereof from the office of Mrs. Strauss' attorney so that there was no delivery; and that the agreement "fell through." But aside from these facts, the language of the agreement does not have the conclusive effect for which American Acceptance contends. There was abundant testimony before the commissioner showing that the transaction was a sale and purchase of the notes. The commissioner was justified in concluding that the indecisive language of the questionable agreement did not overcome the strength of the oral testimony and in finding that "it was not the intention of Mrs. [Strauss] to release the deeds of trust, nor was it her intention to give up valuable securities, the notes secured by the two . . . trusts."

While the report of a commissioner in chancery does not carry the weight of a jury's verdict, Code, § 8-250, it should be sustained unless it plainly appears, upon a fair and full review, that his findings are not supported by the evidence. *Thrasher* v. *Thrasher*, 202 Va. 594, 604, 118 S. E. 2d 820, 826 (1961). Here, the findings of the commissioner were supported by the evidence, the findings have been approved by the trial court, and we will not disturb them. The decree appealed from will, therefore, be affirmed.

*Affirmed.*