## Richmond

## JOHN W. PEARSALL V. RICHMOND REDEVELOPMENT AND HOUSING AUTHORITY

March 3, 1978.

Record No. 761445.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Compton, JJ.

*Eugene W. McCaul (McCaul, Grigsby and Pearsall,* on briefs), for plaintiff in error.

*W.S. Cudlipp, Jr. (Cudlipp and Runkle,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the Court.

In this eminent domain proceeding instituted under Virginia's Housing Authorities Law (hereinafter the Act), Code §§ 36-1 to -55.6, we consider a question of evidence and the problem of so-called "condemnation blight", a condition which often stems from urban renewal projects.

This action was filed on December 23, 1975 by appellee Richmond Redevelopment and Housing Authority, a political subdivision of the Commonwealth, Code § 36-4, against appellant John W. Pearsall and others to acquire approximately 70 parcels of real estate in the City of Richmond needed for slum clearance and eventual redevelopment. The property, located in an area known as "Fulton Bottom", is at the eastern boundary of the city and lies near the north bank of the James River. The trial commenced on May 11, 1976 and after taking a view and hearing testimony during four days, the commissioners, with one dissent, reported that Pearsall should be awarded $172,000 as compensation for the land taken, $300 as damages to the

residue of the property not taken, and $19,850 as damages pursuant to § 36-27 of the Act. In an order entered July 2, 1976, the trial court overruled exceptions filed by both the Authority and Pearsall and confirmed the report of the majority of the commissioners. To this order vesting title to the property in the Authority, we granted the condemnee a writ of error limited to the consideration of the questions which we shall discuss *infra*. The Authority assigned cross-error.

"Condemnation blight" has been used "to denote the debilitating effect upon value of a threatened, imminent or potential condemnation." 4 Nichols, The Law of Eminent Domain § 12.3151[5] at 12-475 (rev. 3d ed. 1977) (hereinafter Nichols). This principle has evolved in other jurisdictions from the quest to fulfill the constitutional guarantees that private property shall not be taken or damaged for public uses, without just compensation. See U.S. Const. amend. V; Va. Const. art. I, §§ 6, 11. In a routine condemnation proceeding, of course, the just compensation to be awarded is determined as of the time of the taking. *White* v. *State Highway Comm'r*, 201 Va. 885, 887, 114 S.E.2d 614, 616 (1960). But certain affirmative acts of a condemning authority preliminary to the filing of the eminent domain proceeding have spawned litigation in other jurisdictions to determine whether a "taking" in the constitutional sense has occurred in advance of the actual transfer of title to the property. The passage of time between initiation of project planning and actual land acquisition is at the core of the problem. Notice of a contemplated taking becomes common knowledge in the neighborhood to be affected, tenants depart the area, and owners refuse to improve and maintain their property. In some cases demolition takes place on adjacent land, garbage and refuse collection becomes sporadic, and police protection diminishes. It has been contended that such factors have a depressing influence upon the value of the affected properties thus preventing, at the time of the *de jure* taking, a proper determination of the landowner's "just compensation." *See* Kanner, *Condemnation Blight: Just How Just is Just Compensation?*, 48 Notre Dame Law. 765, 767-69 (1973).

The courts, in some cases, have categorized the condemnor's conduct as a "*de facto* taking" and have awarded compensation "as of the date the condemnor substantially interfered with the owner's enjoyment of his property, irrespective of when title was

formally acquired by the condemnor by appropriate proceedings." Nichols at 12-475. The effect of this conclusion is to move the date of acquisition backward in time to reflect the actual taking which preceded the legal taking. *Id.* Under another approach, which involves the condemnation blight principle, "the date of taking is left unchanged but the condemnee is compensated for the loss in value traceable to grossly premature disclosure of the condemnation (or other serious value-depressing actions of the condemnor), prior to the actual taking of the property." *Id.* The distinction between the two approaches is not merely theoretical. Both the award alone and the award as increased by the interest allowance are directly related to the time of the taking; to decide that the taking was complete at an earlier date would, of course, require that interest run from that date. In a case involving substantial sums of money, such a consideration becomes a matter of major importance. *City of Buffalo* v. *J. W. Clement Co.*, 28 N.Y.2d 241, 254-55, 269 N.E.2d 895, 903, 321 N.Y.S.2d 345, 356-57 (1971).

The preceding is but introductory to consideration of § 36-27 of the Act. Generally, that section gives a housing authority in Virginia the right to acquire by condemnation any real property which may be necessary for the purposes of such authority under the Act. It also provides that the authority may exercise the power of eminent domain in the manner provided in Code §§ 25-46.1 to -46.36, the Virginia General Condemnation Act. In 1958, the General Assembly amended § 36-27 and incorporated the condemnation blight concept by adding a provision not found in the general condemnation statutes. The amendment authorizes allowance of additional compensation as "damages" to property owners whose land is taken under the Housing Authorities Law. Insofar as pertinent here, that part of the statute added in 1958 provides:

"The court in which condemnation proceedings are pending may hear evidence and determine whether there has been unreasonable delay in the institution of the proceedings after public announcement by the condemnor of a project which necessitates acquisition by the condemnor of a designated land area consisting of or including the land sought to be condemned. If the court determines that such unreasonable delay has occurred, it shall instruct the commissioners in such proceedings to allow any damages proved to their satisfaction

by the landowner or landowners to have been sustained to his or their land during and because of such delay, in addition to and separately from the fair market value thereof, but such damages shall not exceed the actual diminution if any in fair market value of the land in substantially the same physical condition over the period of the delay." Acts 1958, ch. 518.

As we turn to the chronology of this controversy, it is important to note that in the midst of the trial, over the strenuous objection of the condemnee, the trial court read to the commissioners Instruction 10, which provided:

"The Court instructs the jury that there was an unreasonable delay in the institution of this suit from April 13, 1971 until December 23, 1975, and that you may allow any damages proven to your satisfaction by the landowner to have been sustained to his land during and because of such delay in addition to and separately from the fair market value thereof, but such damages shall not exceed the actual diminution if any in fair market value of the land in substantially the same physical condition over the period of delay."

As the result of this ruling, the commissioners were not permitted to hear any testimony or consider any other evidence concerning facts or events which occurred prior to April 13, 1971, which date was exactly one year after the City Council of Richmond by ordinance approved the project which culminated in the taking in question. So as we recite the facts, it should be remembered that all of the pre-1971 evidence came into the record out of the presence of the commissioners.

In November of 1962, a Richmond newspaper reported: "A slum clearance and redevelopment program for the Fulton area has been given top priority in a proposed Community Renewal Program for Richmond." The report was based on comments made the previous day by Frederick A. Fay, executive director of the Authority, when he was explaining the program to "a citizens' advisory planning council." The news article stated that Fay's comments resulted in "the first public disclosure of the contents of the program", which recommended "action to correct slum conditions and to prevent the development of blight in presently sound neighborhoods." Another article at that time reported: "If approved by City Council, the community renewal

program would serve as a master plan for incessant future efforts to prevent blight." That article further stated that: "Housing authority officials are explaining the program to several advisory groups that were consulted during its preparation. After this final review, the program will be printed and submitted to Council." Still another article published that same month said: "The Community Renewal Program will go to City Council sometime after January 1. Council must approve it before it could become effective."

More than three years later in February of 1966, another newspaper article, headlined "Fulton is First Target in Renewal Program", reported that the Fulton area, which includes Fulton Bottom and Fulton Hill, was to receive priority in "the city's soon-to-be released Community Renewal Program." The article quoted Fay as confirming this priority following a suggestion by the city's Director of Public Works that a street improvement project in Fulton "be held up pending release of the long-awaited CRP." The works director was quoted as saying: " 'There's no sense spending money in there now if the whole thing's going to be part of a rehabilitation program for which other funds may be available.' " The article also stated that Fay "cautioned" that "anything which results from the CRP studies will necessarily be a matter of City Council policy." It quoted Fay as follows:

" 'The CRP will not suggest an urban renewal project in such-and-such a community — that's entirely within the power of City Council to decide,' he said.

" 'But [the Director of Public Works] is entirely right when he says that Fulton is the first program suggested in the CRP.

" 'What will be proposed, though, is a study to determine how the city should move in the area.

" 'There are many considerations which will have to be made.

" 'The study will be an attempt to get the area into a planning concept, but market possibilities would dictate the final decision.' "

Nearly six months later, on August 11, 1966, a 142-page document issued by the Authority entitled "Community Renewal Program, Richmond, Virginia, 1966" (hereinafter the Report) was presented to the City Council. The Report divided the entire city geographically into 19 areas. A letter, signed by

the City Manager and by the Chairman of the Authority, transmitting the Report to Council noted that the "harmonious and efficient growth of Richmond" could be achieved only through the coordinated effort of all "city-building activities, whether public or private." The letter noted that the city administration and the Authority felt that the city's efficient growth could be realized if the "Council, governmental agencies and institutional bodies, civic groups, businessmen and citizens have an understanding of what Richmond can ultimately become, what needs to be done and what resources and assets are available to be utilized in achieving the objectives." The letter concluded by stating that the purpose of the Report was "to compile, evaluate, index and present such data from all known sources to aid [City Council] in evaluating the recommendations contained herein and establishing the program to be undertaken."

The Foreword of the Report began:

"The Community Renewal Program is first of all a **program** — a continual function and not an isolated event or a single effort. It is a program whereby communities, with assistance from the Federal Government, can assess in broad terms their overall need for renewal and develop a sequence of community actions designed to meet these needs. Renewal in this sense includes all of the inseparable activities by means of which a city grows and regenerates itself. In addition to the more restricted concept of renewal as clearance and replacement of obsolete or blighted development, this usage includes: rehabilitation and conservation of all types of property, enhancement of economic opportunity, efforts toward optimum social conditions, extension or improvement of utilities and public facilities, protection of sound and useable development and even the guidance of development in areas now vacant."

The Foreword also stated:

"Some of the functions of a Community Renewal Program have been performed in Richmond. However, the comprehensive quality — that of coordinating many activities and of expressing common objectives is lacking. . . . There is, in all cities, a great need for a single program to draw together and coordinate public and private efforts to maintain that

which is good, improve or replace that which is deficient or worn out and guide what is to be accomplished to further municipal development. This need can be met by the Community Renewal Program. . . .

"The broad objectives of the Community Renewal Program, therefore, are:

". . . to organize the resources of the community to meet the problems of urban life.

". . . to progressively eliminate blight and deterioration of the physical structure of the city and thus preserve economic opportunity and ultimately human values.

". . . to provide for optimum new development or redevelopment.

\* \* \*

"The plan contained in this report is Richmond's Master Plan. The program of action is parallel to the Capital Improvements Program, a process in which Richmond has pioneered. The Community Renewal Program is intended to be used as a means of coordinating the Master Plan, the Capital Improvements Program, improvements by other public agencies and the urban renewal activity of the city.

\* \* \*

"The success of the Community Renewal Program is dependent on the understanding, support and cooperative action of property owners, tenants, builders, civic groups and lending institutions. It will not be possible to implement the Community Renewal Program by governmental action alone. There is need for substantial private investment in addition to municipal, state and federal assistance.

"In the final analysis the success of this Program will be dependent on the citizens of Richmond. An informed public working toward common objectives through aggressive governmental leadership can create and control an unprecedented opportunity for Richmond's growth and improvement."

Under "Recommendations", the Report stated:

"The culmination of the Community Renewal Program is presented in the form of a six year program based on a

knowledge of long term needs. It is a program which will need to be reviewed and extended annually — the past year's achievements removed from the list and a new year's schedule added.

"The initial six year program is summarized as follows:

"FIRST PRIORITY ... prepare a general neighborhood renewal plan for the Fulton area and implement its rehabilitation, clearance and redevelopment provisions through a sequence of coordinated public and private actions."

The property in issue here was in "Planning Area No. 9" of the Report. The "existing conditions" there were described as follows:

"Fulton Bottom is in a state of transition from residence to industry. The process is extremely slow and probably could not be completed without public assistance.

"Fulton Bottom contains nearly 800 dwelling units, more than half of which may be classed as deteriorated. These dwellings are old with less than 3% built since 1950. Only a limited amount of residential demolition has occurred since 1950. A great number of dwelling units are without adequate plumbing facilities. Understandably the value of properties in Fulton Bottom ... is among the lowest in the city."

These conditions were also noted on a map of the area:

"FULTON BOTTOM. Old structures in generally poor condition — Many outside toilets — Poor environmental sanitation — Many narrow, rough cobblestone streets — Heavy through traffic. Old deteriorated commercial structures."

The then-existing land use of most of the parcels in question was described in the Report as "mixed" with "transition to industry" from low-grade residential use.

The concluding section of the Report noted that the program "must be considered only as a beginning" and that the period covered by the program was identical to Richmond's Capital Improvement Program "to which it is related". As to the Fulton area, the Report recommended that a General Neighborhood Renewal Program (hereinafter GNRP) be prepared to "develop and correlate the required overall land use plan, street plan and

other improvement plans for Fulton and adjacent interrelated areas" and that the GNRP "include a recommended sequence of actions." The Report also recommended that the City Council authorize the Authority to seek federal assistance to study the Fulton area and prepare a GNRP. The Report estimated that 12 to 18 months would be used to ascertain proper land use, marketability of the land, "relocation resources", probable costs and relationship to the city's Capital Improvement Program. The Report next suggested that when the GNRP was completed and "approved by City Council", a "sequence of required actions including federally assisted projects . . . would be established."

The evidence shows that during the three and a half years following delivery of the Report to City Council, a GNRP for Fulton was prepared with active participation by members of the Fulton community. Mass meetings were held in the area. The citizens retained a planning consultant. Efforts were made by the residents to develop some of Fulton into a new residential community with "united disapproval" being shown toward the intention of the city to develop the entire area for industrial use.

The Fulton GNRP, which recommended land clearance and redevelopment of Fulton Bottom, was finally completed and approved by the Authority in February of 1970. The City Council approved it on April 13, 1970. Fay testified that there had been no public announcement by the Authority of the GNRP prior to that date.

The evidence also shows that during the six-year period beginning with Council's April 1970 approval of the project, the Authority acquired by deed and condemnation a total of 890 parcels out of the 1250 parcels to be acquired in the entire Fulton area over the length of the project. As to the parcels involved in this litigation, the record indicates that during the almost six-year period after Council approval of the project and before this suit was filed in December of 1975, the Authority and Pearsall were engaged in settlement discussions in an attempt to agree on valuation of the property in question. These efforts were unsuccessful, each party now accusing the other of being unrealistic in their respective stands taken on value during the negotiations.

As shown from an affidavit filed post-trial and from the testimony heard out of the presence of the commissioners, it appears that Pearsall intended to show that Fay's 1962 speech

caused the immediate onset of condemnation blight; that the Authority participated in plans to relocate tenants; that tenants moved out and few moved in; that it became necessary to "board up" vacant buildings; that vacant buildings invited vandalism and many had to be demolished before the "taking" occurred; that the property became a dumping ground for abandoned automobiles and other debris which had to be removed at the owner's expense; that publicity surrounding the Authority's Report in 1966 compounded the process of condemnation blight; and that, but for this process, the residential parcels would have undergone a transition to industrial uses thus rendering the properties more valuable than they appeared when viewed by the commission.

Among the instructions read to the commission at the conclusion of the evidence was Instruction 8, not objected to by either party, which provided:

> "The commissioners must determine the fair market value of the land or interest therein being condemned, not what the land or interest therein may be worth to the Richmond Redevelopment and Housing Authority or to the owner personally. And the use to which the land is to be put by the Housing Authority shall not affect your estimate of its fair market value at the time of the taking. *You are to estimate the fair market value in view of all purposes to which the land is reasonably and naturally adapted today just as though there [had] been no announcement or prosecution of any urban renewal program.*" (Emphasis added)

In another instruction, the commissioners were told to determine fair market value of the property as of May 11, 1976, the day of the view.

According to the testimony of the expert witnesses, the value of the property taken ranged between $102,975 and $436,055; as stated, the value award was $172,000. Pearsall attempted to show that during the 14-year period prior to May of 1976 there were 78 structures which would have contributed $147,300 in aggregate value to parcels taken had such structures been in the same condition at the time of taking and had they not undergone "forced removal or deprivation of practically all utility" as a result of the 1962 announcement and the ensuing "pursuit of urban renewal." He asserts that $88,300 of this aggregate value

represents improvements lost before Council approval was given in April of 1970. As we have stated, $19,850 was awarded as damages incurred after April 13, 1971, pursuant to Instruction 10, *supra*.

On appeal, the condemnee, seeking a new trial, says two questions are presented under the limited scope of the writ of error: (1) "[H]as the condemnee been denied his constitutional right of just compensation by rulings of the trial court refusing to allow the condemnee to fully develop the value of his land taken by the Authority?" and (2) "[D]id the court err in its interpretation of, and instructions and rulings on evidence with respect to [Code] § 36-27 ... dealing with what is commonly termed condemnation blight?" We shall discuss these questions in reverse order.

■ The condemnee argues in support of his position on the second question, in accordance with his proffered evidence, that the trial court misinterpreted § 36-27 and misapplied it to the facts of this case. He contends that the "public announcement" of this "project", in contemplation of the statute, occurred at the time of Fay's 1962 speech or, at the very latest, when the Report was delivered to City Council in 1966, and not when Council approved the redevelopment plan (GNRP) in 1970. He says "project" is used in the statute in a generic sense, and thus announcement of a "program" is the time from which delay must be measured. Consequently, he urges, Instruction 10 and the associated evidentiary rulings which limited him to post-1971 conditions in proving his claim for § 36-27 damages were erroneous. We do not agree.

As we have already pointed out, our General Assembly (unlike the legislatures of most other states) has confronted the problem of condemnation blight in urban renewal cases and provided by statute for recovery of damages for such losses, if proved by the landowner. Without legislation, one of the most perplexing problems for other courts dealing with this subject has been to determine the time of onset of condemnation blight, that is, the time after which a housing authority may be held to have waited an unreasonable period of time to proceed with the actual taking of the target property. *See* Annot., 5 A.L.R.3d 901. The facts of this case illustrate the nature of such a dilemma, which would exist here but for the provisions of § 36-27.

That statute authorizes the trial judge to hear evidence and determine whether there has been an unreasonable delay *"after public announcement* by the condemnor of *a project"* which requires acquisition of the subject property. Thus, the questions (1) whether there has been an unreasonable delay and (2) the period of such delay are questions of fact to be decided by the trial court in each case. But when during the urban renewal sequence may this delay be found to have occurred? The resolution of that issue is a question of law. From a reading of only § 36-27, this inquiry is not completely answered because the perplexing question still remains: When does the "public announcement" of the "project" take place? That query is answered, as the Authority argues, by referring to Code § 36-51, also a part of the Act, and reading that section together with § 36-27.

In pertinent part, § 36-51 provides that an authority shall not initiate any "redevelopment project" under the Act until the governing body of each city in which any of the area to be covered by such project is situated *has approved a* *"redevelopment plan",* as defined in the statute. So, reading the two statutes together, there may be no unreasonable delay resulting from a contemplated urban renewal procedure until there has been a "public announcement"; there can be no "public announcement" until there is a "project"; and there can be no "project" until the local governing body approves a "redevelopment plan", a document which cannot be formulated without time-consuming, extensive, detailed study. Thus, it is manifest that in the chronology of the urban renewal process, the General Assembly has implicitly selected the time when the governing body approves the concept as the date before which the authority may not be charged with a delay which will invoke the principle of condemnation blight; this is when "public announcement by the condemnor" is deemed to have taken place. Report in a newspaper, or other media, is not required for there to be a "public announcement". Formal action by a governing body which is a matter of public record is just as much a "public announcement" as is a news story in a publication of general circulation.

The facts of this case illustrate the fairness of the rule and confirm the legislature's wisdom. Fay's 1962 "speech" was merely an explanation of a proposed program made to an

advisory committee. The news reports at the time emphasized that the city-wide program required approval of the local governing body before it could become effective. The 1966 Report was but another step in the planning process and was an effort to coordinate community planning on a long-range basis. The formulation of the redevelopment plan (GNRP) was yet an additional planning stage preliminary to formal City Council approval. Such approval was publicized as being necessary before a "sequence of required actions" to condemn could be established. Thus, until the city became committed to the renewal program and formally adopted it as a "project", the planning could have all been for naught for one of any number of reasons. For example, Council may have refused to adopt the redevelopment plan, in which case, as the landowner here candidly admitted at the bar, the condemnee would have had no enforceable eminent domain claim for compensation for any damages caused by the mere planning process. *See* Annot., 37 A.L.R.3d 127. His claim would have been *damnum absque injuria*. In a similar vein, we noted in *Bristol Redevelopment & Housing Authority* v. *Farmbest*, 215 Va. 106, 108, 205 S.E.2d 406, 408 (1974), when determining that a landowner had no right to damages for moving costs incurred by reason of a proposed taking, that:

"As landowners are aware, condemnation proposals often fail. Sometimes, as here, proposals to condemn require approval of a local legislative body or a federal executive agency, or both. Sometimes, an approved proposal is frustrated by refusal or failure to fund. Sometimes, the proposed project is modified to exclude part of the property originally sought. And sometimes, for practical or policy reasons, the project is abandoned altogether."

In sum, we hold that, under the facts of this case, the trial court correctly ruled that § 36-27 prohibited a finding that any unreasonable delay by the Authority could have occurred prior to April 13, 1970, the date the "program" and "plan" for proposed urban renewal became a formal "project" as the result of City Council approval. We also hold, and this disposes of the cross-error, that there was sufficient evidence to support the finding of the trial court that there was in fact an unreasonable delay and that the period of delay ran from April 13, 1971 to the date this proceeding was instituted.

In support of his position on the first question, the condemnee argues that the trial court should have allowed him to present pre-1971 evidence to the commission not only upon the damage issue discussed, *supra*, but also upon the basic issue of present fair market value of the land taken. He asserts that he was prevented from developing "the basis for the valuation of his land as industrial property under Instruction 8", *supra*. He complains that he was prohibited from presenting testimony that other comparable residential areas which, like his, were industrially zoned and predominantly owned by investors, had, when free of any condemnation threat, "effected the transition from residential to industrial uses." He urges that he should have been able to relate such testimony to Fulton Bottom values by demonstrating that "had not the urban renewal blight existed for some 13 to 14 years, the transition to industrial uses would also have occurred in Fulton through the operation of natural market forces of demand and availability."

The Authority responds that such a contention was never made in the trial court and therefore the condemnee should be prohibited from urging such a theory for the first time on appeal, citing Rule 5:21. The Authority argues that when the trial court ruled on the issue which was the subject of Instruction 10, the court in fixing the time limitation only had in mind the question of damages under § 36-27, based on the argument of both counsel addressed to that specific issue. The Authority says that it was incumbent upon the condemnee to advise the court below that he intended to rely on proof of pre-1971 events on the question of present value and to notify the court that the last sentence of Instruction 8 permitted such evidence. The Authority argues, alternatively, that if the point was preserved for appeal, the trial court properly excluded such evidence on the value issue.

To this argument, Pearsall rejoins that he did raise the issue below and that the trial court made two inconsistent rulings, one correct and one incorrect. He argues that Instruction 10, *supra*, to which he objected, was erroneous under the facts of this case because it limited the proof for the purposes of § 36-27 to post-1971 events. He says that Instruction 8, *supra*, to which he did not object, was a correct statement of the law and actually authorized consideration of pre-1971 evidence which he was prevented from bringing before the commission. He says that

our Rule requiring objections to be stated in a reasonably specific manner in the trial court for the purpose of preserving the point on appeal contemplates objection to erroneous rulings of the court, not correct ones. Accordingly, the condemnee continues, he had no duty to object to Instruction 8 which, as written, permitted him to present pre-1971 evidence on the issue of present value. We reject his contentions.

We have examined this entire record in great detail and given the condemnee's trial court arguments the benefit of every doubt. As the result of this examination, we are satisfied that trial counsel for the condemnee at no time stated to the court below, with the "reasonable certainty" required by the Rule, the issue and argument the condemnee now, through different counsel, presents on appeal. On the condemnation blight issue during the trial, every colloquy between condemnee's counsel and the court below focused on the effect of the phenomenon on § 36-27 damages and not on use of pre-1971 evidence as it bore upon present fair market value of the land taken. The condemnee's proffered testimony and his lengthy post-trial affidavit concentrated on the damage issue alone. Indeed, condemnee points to the refusal of his tendered Instruction C to buttress his argument that he presented this present value issue to the trial court. But C dealt with the § 36-27 damage question only. It provided, in part (emphasis supplied), that: "Accordingly, the Court instructs you to allow, as the second element of just compensation, *in addition to and separate from the fair market value of the property today*, any damages to his property proved to your satisfaction to have been sustained by the owner during and because of such delay." In addition, if during the trial condemnee was of opinion, as he now argues, that the ruling on Instruction 8 was inconsistent with Instruction 10, such alleged error should then have been brought to the attention of the trial judge. It was not. We note, however, that six weeks after the hearing, during oral argument of the exceptions to the commissioners' report, the condemnee started to shift his legal position and alluded to the issues, *supra*, which were not raised during the trial but which are now advocated on appeal. He has not here relied on that circumstance to rebut the Authority's argument on the procedural flaw, and properly so. The trial court having overruled the exceptions, we would not find an abuse of discretion in refusing to allow the injection of a

new theory into the case at that late stage of the proceeding. *Cf.* *Smith* v. *Combined Insurance Company*, 202 Va. 758, 762, 120 S.E.2d 267, 269-70 (1961). "This is an appellate court, and it hears cases on the theory upon which they were tried in the lower court, reviewing those points properly raised, decided, and preserved." *Strauss* v. *Princess Anne Marine*, 209 Va. 217, 221-22, 163 S.E.2d 198, 202 (1968). Accordingly, we will not consider whether the trial court erred in refusing to permit pre-1971 condemnation blight evidence upon the basic issue of present fair market value.

For the foregoing reasons, the judgment appealed from will be

*Affirmed.*