Present: Carrico, C.J., Compton, Stephenson, Whiting,[1] Lacy, Hassell, and Keenan, JJ.

LEONARD SACKADORF, ET AL.

v. Record No. 941561    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        September 15, 1995
JLM GROUP LIMITED
PARTNERSHIP, ET AL.


                FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                        Paul F. Sheridan, Judge


    In this appeal involving the priorities of several deeds of trust, we consider 1) whether a transaction structured as an assignment of a note and first deed of trust was in fact a payment and satisfaction by the deed of trust debtor that extinguished the first lien; and 2) whether modifications to the first deed of trust and other documents following the purported assignment, and physical changes made to the property by the deed of trust debtor, require that the junior lienors be advanced in priority.

    Leonard Sackadorf, Dominic Foglio, Leo Wilder, and Lodging Consultants, Ltd. Pension Fund were the beneficiaries of two junior deeds of trust in which Leroy E. Batchelor, Jr., was the designated trustee (collectively, the complainants). They filed a bill of complaint seeking a declaratory judgment that the lien of American Security Bank, N.A. (ASB), was not entitled to retain first priority on the property in question. The defendants

_____

[1] Justice Whiting participated in the hearing and decision of this case prior to the effective date of his retirement on August 12, 1995.

before the trial court were JLM Group Limited Partnership (JLM Group), which executed the deeds of trust, one of JLM Group's partners, and ASB and its substitute trustees.

The trial court heard the evidence ore tenus and entered judgment in favor of the defendants. Therefore, we consider the evidence and all reasonable inferences it raises in the light most favorable to the defendants. Quantum Dev. Co. v. Luckett, 242 Va. 159, 161, 409 S.E.2d 121, 122 (1991).

Sackadorf, Foglio, Wilder, and Rita Wilder (collectively, the sellers) formerly held all the interests in a partnership that owned as its sole asset two adjacent parcels of land (collectively, the property). Parcel 1 was unimproved, and Parcel 2 was the site of several buildings constituting a motel.

By a Partnership Interest Purchase Agreement (the Purchase Agreement) executed in November 1984, the sellers agreed to assign all their partnership interests to Saul H. Bernstein and Barrett Penan. By later assignment, the sellers transferred their interests to Bernstein, Penan, and several others, who became the partners composing JLM Group. This assignment also conveyed the property to JLM Group.

The Purchase Agreement provided that portions of the purchase price would be represented by notes payable to the sellers and to Lodging Consultants, Ltd. Pension Fund, which was controlled by Sackadorf and Foglio. These notes were to be secured by second and third deeds of trust on the property.

The sellers further agreed that JLM Group could place a first deed of trust on Parcel 1 to secure construction financing, provided that the "improvements on Parcel 2 remain intact as a self contained operating facility capable of providing to guests the services which are now available." The Purchase Agreement provided for survival of its provisions after closing of the transaction; however, the Purchase Agreement was not recorded.

By the time of the closing of the transaction in March 1985, JLM Group obtained financing from Dominion Federal Savings and Loan Association (Dominion) to acquire the property, rehabilitate the existing motel on Parcel 2, and construct an addition on Parcel 1. Dominion agreed to make an initial disbursement of $9,016,000 and future advances for construction, up to a total amount of $14,500,000.

JLM Group executed two notes to Dominion in the amounts of $8,000,000 and $6,500,000, each bearing interest at 13.25%. In addition, JLM Group signed a note payable to Lodging Consultants, Ltd. Pension Fund in the amount of $500,000 (the Pension Fund Note), and a series of notes payable to the sellers individually in amounts aggregating $750,000 (the Series Note).

JLM Group executed a first deed of trust encumbering Parcel 2 to secure the $8,000,000 note given to Dominion. An additional deed of trust granting a first lien on Parcel 1, and a fourth lien on Parcel 2, was recorded to secure both the $8,000,000 and the $6,500,000 Dominion notes. Dominion's deeds of trust

provided that they and the underlying notes may be assigned, and that the deeds of trust may be changed, waived, discharged, or terminated by written instrument.

The Pension Fund Note and Series Note were secured by deeds of trust stating therein that they were second and third in priority, respectively, on Parcel 2. These deeds of trust, which appeared on pre-printed legal forms, did not contain any language stating that they were subordinated conditionally and did not incorporate or refer to the Purchase Agreement. They were recorded immediately following Dominion's deed of trust securing its $8,000,000 note on Parcel 2.

In early 1986, JLM Group applied to ASB to borrow $14,500,000, with interest at 10.25%, to "refinance" the Dominion loan. Several of the documents thereafter executed between ASB and JLM Group stated that the purpose of the loan was to "refinance" or "retire" the Dominion loan. However, when the transaction closed in May 1986, Dominion executed and delivered to ASB an "Assignment" of all its interest in its notes and deeds of trust, endorsed the notes payable to the order of ASB, and delivered the original notes to ASB.

Dominion delivered these documents to ASB's attorney on May 19, 1986, with a letter authorizing their transmittal to ASB upon Dominion's receipt of approximately $11,589,786. This amount included principal, interest, and a prepayment penalty required by the terms of the Dominion notes.

On May 20, 1986, the transaction closed. As shown on ASB bank statements, ASB transferred $14,500,000 into a newly opened ASB account titled "ASB Loan Escrow Account for JLM Group Ptnrs" (the Escrow Account). On the same day, approximately $11,600,000 was transferred from that account to the settlement agent.

The settlement statement shows a sum denominated "Payoff to Dominion Federal" of approximately $11,589,786, equal to the total of the amounts demanded in Dominion's May 19 letter. The balance of the $11,600,000 transferred from the Escrow Account was retained by the settlement agent for legal fees and recording costs.

The settlement statement further shows a loan origination fee of $145,000 payable to ASB. On May 22, 1986, the Escrow Account was debited for $145,000. Interest was credited to the account in May 1986 and in the months following.

At the May 1986 closing, JLM Group executed a "Replacement Promissory Note" payable to ASB in the amount of $14,500,000, with interest at 10.25%, and a "First Amendment, Restatement and Consolidation of Deeds of Trust, Assignment of Rents, and Security Agreement" (the Amended Deed of Trust). The Amended Deed of Trust recited the existence and validity of the Dominion notes and deeds of trust, restated the priorities of Dominion's liens on each parcel, and provided that the Amended Deed of Trust "shall be entitled to the same lien and priority as the Original Deed of Trust."

The agreement between JLM Group and ASB under the documents executed between them in 1986 varied in several respects from the 1985 agreement with Dominion. Interest on the ASB note was 10.25% as compared with 13.25%. Because of the lower rate and different amortization, JLM Group's payments under the ASB loan were lower than under the Dominion loan.

The ASB note, like the Dominion notes, matured in approximately March 1990. However, the Dominion notes had provided that the original term could be "automatically extended" for five years upon certain conditions, including a showing that there was no "deferred maintenance" on the property.

Further, the guaranty agreements required by each lender differed. ASB limited the guarantors' liability to $5,500,000. The guaranty that Dominion obtained imposed liability up to $14,500,000, which would be reduced to $1,250,000 once the property had achieved a specified debt service coverage ratio.

ASB's deed of trust, unlike Dominion's, provided that any "material adverse change" to the finances of JLM Group's general partners or its guarantors would constitute a default. ASB's deed of trust also permitted the lender to apply insurance proceeds to payment of its secured debt, rather than to repair of the premises, after a loss of more than $1,000,000.

JLM Group later defaulted on the ASB loan. At the trial, an attorney employed by the settlement agent, and the Dominion and ASB officials who participated in the 1986 transaction, each

testified that the parties intended and understood that the transaction was a purchase by assignment of Dominion's interests in its notes and deeds of trust. Dominion's official testified further that he executed the Assignment and endorsed the original Dominion notes, and that these notes were not canceled or marked "paid" or "satisfied."

ASB called expert witnesses in the areas of real estate transactions and commercial lending practices, who stated that the 1986 transaction employed all the documentation necessary to accomplish a purchase by assignment. The complainants presented the testimony of John Mandler, an expert on the subject of real estate financing. Mandler testified that language in the Amended Deed of Trust, stating that it was "entitled to the same lien and priority as the Original Deed of Trust," preserved the $8,000,000 first lien priority on Parcel 2, and did not purport to enlarge ASB's senior lien on that parcel.

Dennis M. Coombe, the ASB official who supervised the 1986 transaction, testified that the Escrow Account was under the control of ASB. He explained that ASB had found it necessary to advance the full $14,500,000 at the 1986 closing, in order to assure JLM Group a fixed rate of interest, because ASB was required to purchase all the funds required for the loan at one time.

Coombe further stated that disbursements from the Escrow Account could be made only by an officer of ASB, and that the

funds in the account were ASB's property.  He testified that JLM Group did not have signature authority over the account, was not provided any checks, and did not receive account statements.

Michael Ryan, an expert witness for ASB, stated that it is not uncommon for a bank, when it has fully advanced funds under a construction loan, to establish an interest-bearing escrow account in which to hold in reserve monies not yet disbursed to the borrower.  Witnesses for both parties testified that a borrower's payment of prepayment penalties and loan origination fees is not inconsistent with an assignment between banks.

One of the sellers, Leonard Sackadorf, testified that, when the Purchase Agreement was executed, the motel on Parcel 2 included a free-standing registration building and sign, as well as another building containing a banquet room, which, Sackadorf stated, was an amenity needed to attract large groups to the motel.  However, Sackadorf testified that, within a few years after the 1985 transaction, the registration building and sign were demolished, and the banquet room was converted to use as a registration area.

Although the new building which was erected on Parcel 1 included banquet facilities, no such facilities remained on Parcel 2.  Sackadorf did not state when these changes occurred. However, other evidence suggested that the Parcel 2 alterations took place after the 1986 transaction involving ASB.

After hearing the evidence and arguments, the trial court

denied the complainants the relief sought. The trial court found that, by May 19, 1986, the parties had intended an assignment of the Dominion notes and deeds of trust to ASB, that their actions were consistent with that intent, and that the 1986 transaction was a valid assignment. The trial court further found that the Escrow Account was beyond the control of JLM Group, and that the transfer of funds from the account to Dominion did not constitute payment of the Dominion loan by JLM Group. The trial court stated, "There was neither intentional pay-off of the debt, nor inadvertent pay-off of the debt by the facts and acts and/or omissions here."

Finally, the trial court held that neither the physical changes to the motel nor the modifications in the terms of the senior debt prejudiced the complainants or "caused a loss of their security position." The trial court concluded that the case did not present "any reason in equity to subordinate ASB to the trust position" of the complainants.

On appeal, the complainants argue first that ASB did not acquire Dominion's senior priority through purchase by assignment. Instead, they contend, Dominion's first lien was extinguished in the 1986 transaction, pursuant to former Code § 8.3-603(1), because Dominion's notes were paid from funds owned by JLM Group. The complainants assert that ASB's deed of trust thus secured a "new loan" inferior to the complainants' prior deeds of trust.

In the alternative, the complainants contend that the trial court erred in failing to declare the subordination of ASB's lien.  First, they assert that JLM Group, with ASB's knowledge and approval, failed to maintain the existing motel as a "self contained operating facility" as required by the Purchase Agreement.  Second, the complainants argue that the 1986 modifications to the terms of the original Dominion notes, deeds of trust, and guaranty agreements substantially impaired the complainants' ability to avail themselves of their security.

In response, ASB and its trustees (collectively, ASB)[2] argue that the trial court correctly found that the Dominion notes were paid from funds beyond JLM Group's control, and thus Dominion's lien was not extinguished but was acquired by ASB through a valid purchase by assignment.

ASB further argues that the complainants' deeds of trust did not contain conditions of subordination prohibiting changes to the first deed of trust.  Since the modifications were not significant, did not expose the complainants to additional burdens, and actually benefitted the complainants, ASB contends that the trial court correctly held that equity did not require ASB's lien to be subordinated to the liens of the complainants. We agree with ASB regarding both issues raised.

[2]JLM Group and its partner, Bernstein, have not participated in this appeal.

– 10 –

The legal effect of the 1986 transaction depends on a determination whether JLM Group, the sole obligor under the Dominion notes, was payor of the funds received by Dominion. At the time of the 1986 transaction, former Code § 8.3-603(1) provided, in relevant part: "The liability of any party [to a negotiable instrument] is discharged to the extent of his payment or satisfaction to the holder." Thus, if JLM Group paid or satisfied the Dominion notes, the liability of the sole obligor on the notes was discharged and Dominion's first lien was extinguished.

By contrast, if the person or entity supplying the funds is not a party to the instrument alleged to have been paid, and is not obligated in any way for its payment, then the question whether the transaction "is a payment or a purchase is a question of intention--of fact rather than of law--and is to be settled by the evidence." Cussen v. Brandt, 97 Va. 1, 7, 32 S.E. 791, 793 (1899). See also Strauss v. Princess Anne Marine & Bulkheading Co., 209 Va. 217, 224-26, 163 S.E.2d 198, 203-05 (1968); Union Trust Corp. v. Fugate, 172 Va. 82, 89, 200 S.E. 624, 626-27 (1939).

Here, the trial court found that the Escrow Account, which was the source of payment to Dominion, was beyond the control of the obligor, JLM Group. The trial court heard the evidence ore tenus, and we are bound by its findings of fact, unless those findings are plainly wrong or without evidence to support them.

Code § 8.01-680; Yamada v. McLeod, 243 Va. 426, 430, 416 S.E.2d 222, 224 (1992).

The uncontradicted evidence showed that JLM Group did not have signature authority over the account, and that ASB's approval was required for the transfer of funds into JLM Group's operating account. The trial court's finding that the account was beyond the control of JLM Group is supported by the evidence and is not clearly wrong. Thus, payment from the account was not payment by JLM Group, and former Code § 8.3-603(1) does not control.

We disagree with the complainants' contention that the evidence showed that "ownership" of the account was in JLM Group. The evidence showed that restrictions were placed on JLM Group's access to the account to a degree inconsistent with ownership, and that an ASB official considered the funds to be "the bank's money."

The trial court also found that the parties intended and effectuated the assignment of the Dominion notes and deeds of trust to ASB, and the evidence supports this finding. Although some documents connected with the transaction suggested that a "refinance" was originally planned, the transaction was consummated by endorsement and delivery of the notes, and execution and delivery of a written "Assignment," to ASB.

Participants in the transaction stated that they subjectively intended an assignment, and expert witnesses opined

that the participants' actions were effective in realizing this intention. In addition, as several witnesses testified, although the account was credited with interest, and the funds advanced were used to satisfy Dominion's prepayment penalty and ASB's origination fee, these facts were not inconsistent with ASB's continued control of the account, and its use of the account to fund its purchase of the Dominion notes.

The cases cited by complainants are factually distinguishable from the present case. In those cases, payment was made out of the funds of parties who were primarily liable on the obligations in question. For that reason, the debts were held to be extinguished, regardless of the parties' contrary intention. See Green v. Foley, 856 F.2d 660, 665-66 (4th Cir. 1988), cert. denied, 490 U.S. 1031 (1989); Bank of Russell County v. Griffith, 176 Va. 1, 8, 10 S.E.2d 481, 483 (1940); Citizens Bank v. Lay, 80 Va. 436, 438-39 (1885).[3]

In addition, the evidence presented was not only consistent

_____

[3]The complainants also cite Whitehead v. Planters Bank & Trust Co., 180 Va. 76, 80-81, 21 S.E.2d 724, 726-27 (1942), which involved an instrument that was discharged when the holder assigned it for value to the principal debtors. That case lends no support to the complainants' position, because the evidence in this case did not show either that JLM Group gave value directly to Dominion or that Dominion assigned its notes to JLM Group.

- 13 -

with an assignment; it was inconsistent with payment.  There was no evidence that Dominion recorded a certificate of satisfaction to release its deeds of trust, or that JLM Group demanded that it do so.  Similarly, the evidence showed that Dominion neither canceled the notes nor returned them to JLM Group, but instead endorsed and delivered the notes to ASB.  See Schmitt v. Redd, 151 Va. 333, 339, 143 S.E. 884, 885-86 (1928).  Thus, we conclude that the trial court did not err in holding that Dominion's lien was not extinguished by its receipt of funds derived from the Escrow Account, and that ASB acquired a valid first lien on the property.

The complainants next contend that their liens should be elevated to positions of priority over ASB's lien, as a result of prejudice to the complainants' rights through 1) physical alterations to improvements on the parcel subject to their liens, and 2) modifications in the substituted ASB deed of trust that were adverse to their interests.

We agree with the principle that a senior lienor may not modify the terms of its agreement with the borrower so as materially to prejudice the rights or impair the security of junior lienors, without their consent.  See Shane v. Winter Hill Fed. Sav. & Loan Ass'n, 492 N.E.2d 92, 95-96 (Mass. 1986); Shultis v. Woodstock Land Dev. Assocs., 594 N.Y.S.2d 890, 892 (N.Y. App. Div. 1993); Citizens & S. Nat'l Bank of S.C. v. Smith, 284 S.E.2d 770, 772 (S.C. 1981).  However, we hold that the

- 14 -

record supports the trial court's finding that the evidence failed to show the complainants were prejudiced by the physical alterations to Parcel 2 and the modifications in the senior deed of trust.

First, we will assume, without deciding, that JLM Group's renovations to the motel on Parcel 2 violated the condition in the Purchase Agreement, to which JLM Group agreed, that the "improvements on Parcel 2 remain intact as a self contained operating facility capable of providing to guests the services which are now available." Nevertheless, neither Dominion nor ASB agreed to take responsibility for the fulfillment of the condition and, accordingly, in the absence of fraud or collusion, neither lender had a duty to prevent breach of the condition. See Tuscarora, Inc. v. B.V.A. Credit Corp., 218 Va. 849, 857–58, 241 S.E.2d 778, 782–83 (1978).

Further, the evidence failed to establish collusion or concert of action between JLM Group and ASB. There was no evidence showing that either Dominion or ASB received a copy of the unrecorded Purchase Agreement. Thus, although the complainants argue that ASB gave its approval to building plans that provided for the alterations to the motel, we do not agree that such approval constituted participation by ASB in actions meant to undermine the value of the complainants' security.

The complainants also did not establish that the value of the motel on Parcel 2, considered as a "self-contained facility,"

had declined as a result of the renovations.  No evidence showed that the absence of the banquet room on Parcel 2 resulted in a lower market value.  Nor did the complainants quantify any detrimental effect resulting from the loss of the separate registration building and sign.  Thus, it remained a matter of speculation whether the value of the complainants' security had been materially impaired.

Second, we hold that the terms of JLM Group's agreement with ASB did not materially impair the complainants' security or materially prejudice them by exposing them to risks they had not assumed.  We disagree with the complainants' contention that our decision in First Funding Corp. v. Birge, 220 Va. 326, 257 S.E.2d 861 (1979), supports their contrary position.

In Birge, a trustee attempted to subordinate a seller's deeds of trust to the lien of a single deed of trust covering both lots, in contravention of the express terms of the seller's subordination agreement.  Id. at 333-34, 257 S.E.2d at 865-66. We held that this attempted subordination was beyond the authority given the trustees by the trust document, and that the trustees had "permitted the quality of [the construction lender's] security to be enhanced while at the same time caused the value of [the seller's] security to be undermined."  Id. at 334, 257 S.E.2d at 866; see also Business Bank v. Beavers, 247 Va. 413, 416-17, 442 S.E.2d 644, 646 (1994).

In contrast, the complainants' deeds of trust contained no

express conditions of subordination to the $8,000,000 Dominion deed of trust on Parcel 2. Instead, they contained unqualified language of subordination stating that they were "second" and "third" in priority. Further, Dominion's first deed of trust securing its $8,000,000 advance, of which the complainants had notice at the time their subordinated deeds of trust were recorded, included provisions that Dominion's note and deed of trust "may at any time be assigned, in whole or in part," by Dominion, and that the deed of trust may be changed "by an instrument in writing signed by the party against which enforcement of the change . . . is sought."

In addition, the Amended Deed of Trust did not purport to encumber Parcels 1 and 2 with a first lien in the amount of $14,500,000. Instead, it contained language that maintained all lien priorities as they existed under the separate Dominion deeds of trust. Thus, the complainants' deeds of trust on Parcel 2 continued to be subordinated only to a lien on that parcel in the amount of $8,000,000.

The complainants' security was also unaffected by the fact that ASB advanced JLM Group the full $14,500,000, a sum greater than the $11,500,000 needed to purchase the Dominion notes. Both before and after the assignment, the complainants' liens were subject only to the deed of trust securing the first $8,000,000 advanced.

The modifications to the agreement between JLM Group and ASB

were not of such a nature or degree that they materially impaired the security of the complainants' liens.  The modification agreement was highly advantageous to JLM Group in providing for a lower interest rate and significantly decreased payments.  Since these changes improved JLM Group's cash flow and rendered its default less likely, the modifications also benefitted the complainants.

Although the Dominion notes provided for an "automatic" five-year extension, such an extension depended upon the fulfillment of several conditions, including a showing that there was no "deferred maintenance" on the property.  Since the evidence failed to show that these conditions would have been met, the complainants have failed to show that they were prejudiced by the lack of such an extension provision in ASB's note.

The complainants further argue that they were prejudiced because ASB required a guaranty of only $5,500,000 of the total debt, whereas the Dominion guaranty covered a potential $14,500,000.  The Dominion guaranty, however, provided that the guaranty would be reduced to $1,250,000 if JLM Group achieved a specified debt service ratio, and the complainants did not show that the ratio had not been achieved or that the reduction had not taken place.

The trial court recognized that some provisions of ASB's modified agreement with JLM Group might subject the junior

lienors to increased risk. In reserving the right to declare JLM Group in default whenever ASB perceived a "material adverse change" in the financial condition of a borrower or guarantor, and in further reserving the right to apply insurance proceeds to its debt rather than to repair of the property that secured the junior liens, ASB protected itself but potentially disadvantaged the complainants.

Nevertheless, the trial court properly considered these matters in light of all the circumstances of the case, including the complainants' unconditional subordination and their failure to reserve control over any changes in the terms of the senior lien. The trial court also weighed the fact that several provisions of the modified agreement with ASB benefitted the complainants. Thus, in reaching its conclusion that JLM's agreement with ASB did not prejudice the junior lienors, the court considered the evidence and weighed the equities, without looking solely at the rights of one party and ignoring those of the other. See Virginia Pub. Serv. Co. v. Steindler, 166 Va. 686, 698, 187 S.E. 353, 358 (1936).

For these reasons, we will affirm the judgment of the trial court.

Affirmed.