# CIRCUIT COURT OF KING GEORGE COUNTY

NationsBank of Va., N.A.,
Michael R. Nash,
and Carolyn Dee Nash Bates

v.

James R. Nash

March 12, 1997

Case No. (Law) 95-6

BY JUDGE JAMES W. HALEY, JR.

In this declaratory judgment action, the issues are:

(1) Were funds made available by a mother to her son on November 3, 1988, and January 5, 1989, initially loans or gifts;

(2) If initially loans, were either or both subsequently forgiven;

(3) If unforgiven loans, is this action to establish them barred by the Statute of Frauds and/or the Statute of Limitations;

(4) Was an admitted loan to the son, evidenced by a promissory note dated April 15, 1986, forgiven by the mother, and if not, is collection barred by the Statute of Limitations.

Robert S. Nash and his wife, Mildred M. Nash ("Mildred"), over years developed a successful warehouse business in Washington, D.C. They had three children, Michael R. Nash, Carolyn Dee Nash Bates, and James R. Nash ("Jimmy"), the defendant in this action. Both Mildred and Robert S. Nash sometimes lent, and sometimes gave, substantial sums to their children.

Mildred had established a custodian account at American Security Bank for the "Mildred M. Nash Revocable Trust" (the "Trust"). The beneficiaries of the Trust were the three children. Jimmy was also a co-trustee of the Trust until his resignation from that position on November 30, 1993. American Security Trust

was also a trustee. NationsBank of Virginia, N.A., plaintiff herein, through various mergers and acquisitions, has become a co-trustee of the Trust and a co-executor of the Estate of Mildred N. Nash.

Sarah Richards was a long-time employee of the warehouse business, but she also functioned as a personal employee of Robert S. Nash and Mildred. In this capacity, she prepared personal correspondence, recorded personal loans and gifts to the children, and did basic bookkeeping.

On November 3, 1988, Ms. Richards, at Mildred's direction, prepared correspondence which Mildred signed authorizing American Security Bank "to make available for my son, James R. Nash, *as a loan*" $130,000 from the custodian account she had established for the Trust. (P. Ex. 5; italics supplied.)

On January 5, 1989, Ms. Richards prepared identical correspondence, which Mildred likewise signed, including the phrase "as a loan," authorizing the disbursement from the same account of $250,000 to Jimmy. (P. Ex. 6.) It is undisputed that Jimmy received these funds totalling $380,000 and has made no repayment on account of either. In addition to preparing these two disbursement letters, Ms. Richards filled in two forms entitled "Notes Receivable" on which she typed "Mildred" and dated each of them the same day as were dated the disbursement letters. Each form recited the corresponding amount of the disbursements, but each distinguished a portion of that amount as principal and a portion as interest. (P. Exs. 12, 13.) None of these four writings state a rate of interest or a repayment date. These two disbursements were not the only disbursements made to Jimmy. Other disbursements in likewise substantial sums were made to Jimmy and there is no claim that they were not in fact gifts.

On April 15, 1986, Jimmy signed a promissory note payable to "The National Bank of Washington, Trust [sic] under the Will of Robert S. Nash FBO Mildred M. Nash" for $100,000 due April 15, 1987, at nine per cent interest per annum. (P. Ex. 15A.) Robert S. Nash had predeceased Mildred and this note became an asset of the Trust. In November 1990, a trust officer of American Security wrote to Jimmy enclosing a "Continuation of Promissory Note" payable to the Trust asking that he sign the same and return it. (P. Ex. 26.) The Trust officer wrote again on July 23, 1991, (P. Ex. 27) June 10, 1992, (P. Ex. 28) and July 23, 1992, (P. Ex. 29) with the same request. Jimmy never executed the continuation agreement. As noted above, it is undisputed that Jimmy received the funds and has made no repayment.

On September 20, 1992, Mildred died, and her will named Jimmy, his brother, Michael R. Nash, and American Security (now NationsBank) as executors, all of whom qualified in the Circuit Court of King George County. After specific bequests of tangible personal property, the residuary of the

estate, which included a 1,370 acre farm in King George County, flowed into the Trust, of which, as noted above, the three children remain the beneficiaries. The Trust divided the farm into ½ for Jimmy, 1/3 to Michael R. Nash, and 1/6 to Carolyn Dee Nash Bates. The balance of Trust assets were to be equally divided (except for a fund for Jimmy to maintain the farm pending disbursements) among the three children.

As will be set out further below, before Mildred's death, the issue had been raised as to whether the 1988 disbursement of $130,000 and the 1989 disbursement of $250,000 were loans or gifts, and if loans, were they forgiven.

On February 5, 1993, Annette L. Stertzer, a trust officer from American Security, co-executor of Mildred's estate, wrote to Jimmy advising that the documentation of the $130,000 and $250,000 disbursements (P. Ex. 6 & 7) showed them to be loans and assets of his mother's estate and further advising that "the Inventory for the estate will be due soon … ." (P. Ex. 4.) In addition to the documentation, Ms. Stertzer had also inquired about the status of these disbursements from Michael R. Nash, Jimmy's brother, and he advised her they were, in fact, loans. Jimmy did not respond to the letter of February 5, 1993. On February 19, 1993, Ms. Stertzer wrote again, asking Jimmy if he "agreed with my information" that the disbursements were loans and further stating that "The loan/gift issues … are the biggest unresolved projects on which I need your timely co-operation and full disclosure … ." (P. Ex. 7.) Jimmy did respond to this letter. On March 17, 1993, the trust officer wrote to Jimmy enclosing a proposed inventory of Mildred's estate and asking he review and sign the same. (P. Ex. 8.)

On March 31, 1993, Jimmy signed, acknowledged and swore the inventory was correct, and the inventory was admitted to record. Specific language in the Certificate of Fiduciary in the inventory recited that: "I solemnly swear … that to the best of my knowledge and belief the foregoing inventory … embraces all the property, both real and personal of the … estate … ." The inventory included as assets "Unsecured Notes" as follows:

> $130,000 Loan to James R. Nash dtd 11/03/88-principal only and $250,000 Loan to James R. Nash dtd 1/05/89-principal only. (P. Ex. 9.)

On December 9, 1993, Jimmy resigned as a co-executor of his mother's estate.

Jimmy takes the position that these two disbursements were initially gifts, not loans, and if loans, they were forgiven by his mother. He further maintains the April 5, 1986, promissory note was likewise forgiven. In support of the

latter proposition, Jimmy relies on a meeting held on August 2, 1990, between Mildred and Susan G. Blumenthal, her attorney who prepared her will. This meeting was documented by a letter dated August 14, 1990, (D. Ex. A) from Blumenthal to Mildred, and by internal memos to the Mildred Nash Trust file dated August 9, 1990, (D. Ex. B) from Mary Gertrude Barry and another dated August 6, 1990, (D. Ex. C) from Catharine Snowdon. Both of these women were working for American Security at the time and attended the August 2, 1990, meeting with Ms. Blumenthal. These three exhibits were found in a file dealing with the Trust and were discovered by Ms. Stertzer during the administration of Mildred's estate. Blumenthal and Snowdon did not testify at trial.

Prior to this August 2, 1990, meeting, a CPA named Steven George Dakes (or a member of his firm at his direction) prepared 1990 tax returns for Mildred. One return was a gift return showing the $130,000 disbursement and the $250,000 disbursement as gifts to Jimmy. One return imputed interest income to Mildred on the basis that the two disbursements were loans to Jimmy. (P. Ex. 14.) Mildred never executed either return. At trial, Mr. Dakes could not remember who requested the dual returns and could only "speculate" as to why they were prepared.

Under Mildred's will, it will be remembered, her 1,370 acre farm in King George County passed to the Trust in unequal shares to the three beneficiaries. Also as noted above, the balance of the Trust assets were to be equally divided among the three children. These provisions of Mildred's will and the Trust were in effect at the time of the August 2, 1990, meeting.

The August 14, 1990, letter addressed to Mildred from Blumenthal documenting the August 2, 1990, meeting makes note of the two disbursements totalling $380,000 and recites the existence of the dual tax returns which were never executed. The August 9, 1990, Barry memo recites that "We discussed the loans/gifts Mrs. Nash had made to her son James ... ." The August 6, 1990, Snowdon memo notes that Jimmy had received "various combinations of loans and gifts" and the "total is somewhere in the area of $700,000 to $800,000." All three defense exhibits make clear that Mildred recognized that Jimmy would receive a disproportionately greater share of Mildred's assets under the will and the Trust, but that she preferred to make no changes. All of these defense exhibits by fair inference consider the $130,000 disbursement and $250,000 disbursement as loans. None of these defense exhibits specifically addresses the question as to whether the $130,000 and the $250,000 disbursements were forgiven by Mildred. Rather, the August 6, 1990, Snowdon memo (D. Ex. C) states:

Mrs. Nash's accountants have amended several prior years returns ... reporting imputed interest on the payments to James which are clearly loans and on which he has not paid interest.

This recital can only refer to the $130,000 and the $250,000 disbursements, because of the reference to imputed interest. In addition, these two were not the only disbursements to Jimmy, because they total only $380,000, not the $700,000 to $800,000 he actually received, the difference being agreed to as gifts.

Mary Gertrude Barry, author of the August 9, 1990, memo, testified that the same accurately represented the substance of the August 2, 1990, meeting with Mildred. As the bank officer dealing with the Trust, she further testified that:

Before making investment changes (in Trust assets) we had to get co-trustee approval for those investment changes ... . I believe I consulted with the co-trustees first before making the investment changes or making the purchases ... .

A series of letters from Ms. Barry to Jimmy during the 1989-1990 period were introduced documenting various purchases and sales by the Trust (P. Ex. 31), upon each of which Jimmy had signed as a co-trustee ratifying the purchases and sales.

Jimmy did not testify at trial.

(1) *Were the funds made available on November 3, 1988, and January 5, 1989, loans or gifts?*

A "gift is effective only if the donor had donative intent at the time of the gift." *Young v. Young,* 247 Va. 57, 63, 393 S.E.2d 398, 401 (1990). Mildred's disbursement letters each recite that the disbursement is "as a loan" and they were entered in the bookkeeping records as "Notes Receivable." Defendant's reliance on *Buchanan, Adm'r v. Higgenbotham,* 123 Va. 662, 97 S.E. 340 (1918), for the proposition that transactions between parent and child are presumed gifts, is not persuasive because that presumption arises only "in the absence of evidence to the contrary ... ." 123 Va. at 671, 97 S.E. at 343. Accordingly, the disbursements of November 3, 1988, and January 5, 1989, are determined to be loans.

*(2) Were the loans of November 3, 1988, and January 5, 1989, forgiven?*

To establish a valid *inter vivos* gift, the person maintaining his status as a donee must show "by clear and convincing evidence every fact and circumstance necessary to show the validity of the gift." *Nelson v. Liggan,* 189 Va. 637, 645, 53 S.E.2d 798, 802, *aff'd* 190 Va. 213, 56 S.E.2d 54 (1949); *Rust v. Phillips,* 208 Va. 573, 578, 159 S.E.2d 628, 631 (1968). One such fact is that "possession of the property must be delivered at the time of the gift ...." *Thomas v. First National Bank,* 166 Va. 497, 504, 186 S.E. 77, 80 (1936). See also *Nelson v. Liggan,* 189 Va. 637, 645, 53 S.E.2d 802, 808, *aff'd* 190 Va. 213, 56 S.E.2d 54 (1949). Delivery may be "actual or constructive," *Taylor, Adm'x v. Smith,* 199 Va. 871, 874, 102 S.E.2d 160, 162-163 (1958), but delivery must show "that the donor surrendered the power of dominion and control over the subject matter ... ." *Snidow v. First National Bank,* 178 Va. 239, 249, 16 S.E.2d 388, 389 (1941), and grants it to the donee. See *Young v. Young,* 240 Va. 57, 63, 393 S.E.2d 402, 405 (1990); *Woo v. Smart,* 247 Va. 365, 369, 442 S.E.2d 402, 404 (1994). Under the circumstances of this case, the subject matter were the letters directing the disbursements as loans or the "notes receivables" forms.

As will be remembered, Jimmy never testified that his mother had forgiven the two loans. Rather, Jimmy relies upon the memoranda generated after the August 2, 1990, meeting with his mother and the testimony of Mary Gertrude Barry, one of the participants in that meeting. The contents of these memoranda only show that Mildred was comfortable with the terms of her existing will, under the terms of which Jimmy, independently of any gifts/loans, was to receive a disproportionate share of her estate. Annette Stertzer wrote to Jimmy inquiring as to the gift/loan issue and later wrote to him her conclusion that the disbursements were loans. Jimmy never responded to either letter. In addition, on March 31, 1993, Jimmy as co-executor of Mildred's estate executed the inventory under oath showing the two disbursements as loans. When a document is executed under oath, "one vouches that the contents of the writing are true." *Wisniewski v. Johnson,* 223 Va. 141, 143, 286 S.E.2d 223, 224 (1982).

There were a number of actions Mildred could take or direct that would have evidenced her intent to forgive the two loans. For example, she could have written something to that effect and delivered or directed its delivery to Jimmy and/or the trustees. She could have marked the letters directing disbursements or the "Notes Receivables" forms paid or forgiven and/or have delivered them or directed their delivery to Jimmy and/or the trustees. She

could have added a codicil to her will or changed the terms of the Trust. She could have executed the gift tax return. She took no such actions.

From the foregoing, the court concludes that the defendant has failed to prove by clear and convincing evidence that the loans represented by the November 3, 1988, $130,000 disbursement and the January 5, 1989, $250,000 were forgiven as gifts to Jimmy.

(3) *Is this action to collect the $130,000 loan and the $250,000 loan barred by the Statute of Limitations and/or the Statute of Frauds?*

Jimmy was a trustee of the Trust until November 30, 1993, and an Executor of Mildred's will until December 9, 1993. In addition to himself, his brother, Michael R. Nash, and his sister, Carolyn Dee Nash Bates, were beneficiaries of each. It is clear that the loans were assets of the Trust because the sums disbursed came from the account which established the Trust.

A trustee owes a fiduciary duty to beneficiaries. In *Broaddus v. Gresham*, 181 Va. 725, 734, 26 S.E.2d 33, 36 (1943), the Supreme Court of Appeals stated that:

> It is well settled that so long as there has been no denial or repudiation of an express and continuing trust ... neither the statute of limitations nor laches will constitute a bar to an account or other proper relief to which the *cestui que trust* is entitled.

That proposition was re-affirmed in *Wigglesworth v. Taylor*, 239 Va. 603, 608, 391 S.E.2d 299, 303 (1990): "in the absence of his denial or repudiation of the trust, which must be communicated to the beneficiary, a fiduciary cannot assert the bar of the statute of limitations or laches against the trust beneficiary."

A statute of limitations does not begin running against a trustee until the trustee has communicated his repudiation of the trust to the beneficiaries. *Russell's Ex'rs v. Passmore*, 127 Va. 475, 511, 103 S.E. 652, 664 (1920); *Rowe v. Bentley*, 70 Va. (29 Gratt.) 756, 760 (1878).

There is no evidence of either a repudiation of the trust or a communication of that repudiation to the other beneficiaries by Jimmy until he resigned as trustee by letter dated November 30, 1993. The instant proceeding was filed on February 2, 1995.

On brief, Jimmy maintains that he was only a "nominal" trustee under the Trust and that, accordingly, his right to assert the bar of the statute of limitations is unfettered. No authority was cited for the proposition that

fiduciary duties are diminished if one is a nominal trustee. In any event, the evidence does not support the proposition that Jimmy was a nominal trustee. As noted above, Ms. Barry, the Trust officer, testified that she needed trustee approval and "consulted with the co-trustees first before making the investment changes or making the purchases ... ." Furthermore, again as noted above, Jimmy executed documents as co-trustee approving those changes and purchases.

The court therefore overrules the plea of the statute of limitations, whether the appropriate statute is Va. Code § 8.01-246(2) or one under the Code of the District of Columbia, the parties agreeing that three years is the limitation under either.

Jimmy relies on Va. Code § 11-2(9) of the Statute of Frauds which requires that "any agreement or promise to lend money or extend credit in an ... amount of $25,000 or more . . ." be in writing and signed by the party to be charged. This subsection was added to the Statute of Frauds, effective July 1, 1990.

This reliance is misplaced. Though the issue was briefed by the parties, it matters not whether this statute is to be viewed as prospective or retrospective, substantive or procedural. This is because the quoted statute applies to executory contracts, not executed ones, that is, it applies to promises to lend money in the future, not to loans already made. See *Charles E. Brauer Co. v. NationsBank*, 251 Va. 28, 466 S.E.2d 382 (1996). As the court has found, both disbursements were executed loans.

Accordingly, the plea of the Statute of Frauds is overruled.

(4) *Was an admitted loan to the son ("FBO Mildred M. Nash"), evidenced by a promissory note dated April 15, 1986, forgiven by the mother, and if not, is collection barred by the Statute of Limitations?*

The plea of the Statute of Limitations is overruled for the reasons set forth in (3) above.

The April 15, 1986, note was a negotiable instrument. Va. Code § 8.3A-104.[1] Discharge of an obligation to pay a negotiable instrument may be accomplished by payment pursuant to Va. Code § 8.3A-602 (formerly Va. Code §§ 8.3-601, 8.3-603), see *Sackadorf v. JLM Group Ltd. Partnership*, 250 Va. 321, 330, 462 S.E.2d 64, 70 (1995), or by tender of payment pursuant to Va. Code § 8.3A-603 (formerly Va. Code §§ 8.3-601, 8.3-604). In addition,

---

[1] The court is aware that the Title 8.3A became effective on July 1, 1993 as a re-designation of Title 8.3. The court will refer to the current designation.

under Va. Code § 8.3A-604 (formerly Va. Code §§ 8.3-601, 8.3-605, 8.3-208), discharge may occur by cancellation or renunciation of the instrument.

This may be accomplished if the person or entity entitled to enforce the note intentionally surrenders the note to the maker, or destroys the note, or adds words to the note indicating its cancellation, or renounces the note in writing. There is no evidence to support any of these methods of discharge.

Finally, under Va. Code § 8A.3-601 (formerly Va. Code § 8.3-601), a note may be discharged "by any act or agreement with the party which would discharge an obligation to pay money under a simple contract." The only theory presented by Jimmy applicable under Va. Code § 8.3A-601 is forgiveness of the obligation. That defense was found deficient in (2) above, and for the same reasons is likewise found deficient with respect to the April 15, 1986, note.

The November 3, 1988, loan and the January 5, 1989, loan did not carry an interest rate[2] or a due date. Accordingly, these loans were due upon demand. Under the evidence presented, the earliest demand date was February 2, 1995, the day the instant proceeding was filed in the Circuit Court of King George County. Interest will run on these two obligations at the judgment rate from that date.

With respect to the April 15, 1986, note, interest will run at 9% per annum, the rate specified in that note.

---

[2] The "Notes Receivable" memorandums broke down the original principal amounts into "interest" and "principal." Nonetheless, the evidence is insufficient for the court to find either loan carried any specific interest rate.